## LIPSE'S EX'R v. SPEARS' EX'R.[1]

(Circuit Court, W. D. Virginia. March, 1882.)

1. EXECUTORS—DEVASTAVIT—ACCEPTANCE OF CONFEDERATE MONEY.

An executor who during the war of the Rebellion received Confederate currency in payment of a specie debt well secured on valuable real estate, without proof of the necessity thereof, was guilty of a devastavit, and the devisees were not devested of their liens upon the estate of their testator for their legacies.

2. SAME—CO-EXECUTORS—SETTLEMENT OF ACCOUNTS.

A settlement of the accounts of one of two executors who resided in Virginia during the war of the Rebellion was not binding on his co-executor, residing in a loyal state.

3. SAME—EXECUTOR'S DEED.

The Virginia statute of March 5, 1863, providing that, whenever any fiduciary residing in that state was authorized to do any act jointly with one or more fiduciaries residing in the loyal states, it should be lawful for the resident fiduciary to perform the act alone, was a nullity; and a deed by an executor residing in Virginia was without effect, as against his co-executor, who resided in Indiana.

In 1859, at his home, in Botetourt county, Va., Moses Lipse died, leaving a will, 12 children, and 391 acres of land. His sons David H. and Samuel were named as executors, and directed to sell the land and divide the proceeds among the children. Both qualified, and in 1860 sold the land to C. C. Spears for $14,858, and received cash $4,952.66, and two bonds of the purchaser, dated 3d October, 1860, each for $4,952.66, with interest from the maturity of each, payable to the executors in one and two years.

From 1850 continuously to the present, David H. Lipse resided in Indiana. He was present at the land sale in 1860, but shortly returned to Indiana, and was never again in Botetourt until 1874. In 1879 the other executor, Samuel Lipse, died in Botetourt, where he always lived, and was during the Rebellion. In 1862 C. C. Spears died, leaving a widow, a child, and a will, and William A. Glasgow qualified as his executor. When the bonds fell due, David H. Lipse and about half the legatees, or their representatives, resided outside the state of Virginia, then under the control of "the organized rebellion called the 'Confederate States Government.' " The only currency then there in circulation was Confederate notes, commonly called "Confederate money," or Virginia bank notes, of about equal value with it. Samuel Lipse was known as a "Union man," put no value on Confederate money, refused to take it, and did not willingly receive it in payment of debts due the estate of his testator or himself. The situation of the estate did not require the collection of the purchase money of the land to pay the debts of the estate, for there were none; nor to make distribution, for half of the distributees were outside of Virginia, within the loyal states, and beyond the reach of the resident executor, Samuel Lipse. Half of the resident distributees refused to accept Confederate money, and there is no proof that any of them were desirous to accept it. In the meantime the bonds of Spears, due the estate, were perfectly solvent, being secured on valuable real estate. Yet Spears' executor went of his own accord in October, 1862, to the house of Samuel Lipse, took with him a large bundle of Confederate money, counted out a sum equal to the unpaid balance due on the land, and insisted on Samuel Lipse receiving it. But the latter refused, saying "it was of no value, and that he had no use

---

[1] This case has been heretofore reported in 4 Hughes, 535, and is now published in this series, so as to include therein all circuit and district court cases elsewhere reported which have been inadvertently omitted from the Federal Reporter or the Federal Cases.

for it." Spears' executor took the Confederate money away with him, after having asked Samuel Lipse if he would take a check on the Bank of Fincastle, which check the latter said he would accept, expecting to receive Fincastle money on it. No check was then given. Spears' executor was a lawyer, and then the president of that bank, and well knew that nothing but Confederate money, or its equivalent in value—Virginia bank notes—was paid out at its counter. See ordinances of the Virginia convention passed June 28, 1861, and July 1, 1861, respectively. Afterwards Samuel Lipse was induced to receive the check of Spears' executor on the Fincastle Bank for the balance of the said purchase money, and surrender the bonds. How induced, the record shows. Two of the legatees (Custer and Hoff) presented the checks of Lipse's resident executor on that bank for their portions, but refused to receive the Confederate money, but afterwards did receive it, under, as they testified, "a compulsion of threats." A part of the Confederate notes so received by Samuel Lipse was sequestrated by the Confederate government. Having thus induced Samuel Lipse to receive the Confederate notes and surrender the bonds, Spears' executor induced Samuel Lipse to execute a deed, without the concurrence or knowledge of his co-executor, David H. Lipse, then in the state of Indiana, conveying the said land, with general warranty, to said Spears' executor. To an objection of Samuel that his conveyance without David's concurrence would be of no effect, he was told by Spears' executor that the general assembly of Virginia had passed an act which met the case. It may be appropriately added that said act was passed March 5, 1863, and that the patron thereof was Green James, then delegate to said assembly from Botetourt. The deed itself recited that it was executed under an act passed March 5, 1863, by the general assembly of Virginia, providing that, whenever any fiduciary residing in this state has been authorized to do any act jointly with one or more fiduciaries residing within the limits of the United States, it shall be lawful for the fiduciary residing in this state to do any such act without the concurrence of the nonresident fiduciary. This act of the general assembly was in contravention of the previous law, and was to remain in force only during the war. This deed was executed 7th April, 1863, and was with general warranty. By deed executed the same day, with special warranty, Spears' executor conveyed the same land to one McCue for $15,000, whereof $3,000 was paid cash in hand, and for the balance, "payable on the 18th August, 1882, in gold coin, of the value of the alloy of the United States in the year 1861, and also for the interest thereon at the rate of six per cent. per annum, payable on the 1st day of January, 1864, and annually thereafter in such funds as may be current in the state of Virginia, or in merchantable corn or flour, at two dollars a bushel for corn and fifteen dollars a barrel for flour, as the said Spears' executor, or his successor, may from time to time elect to receive it, or in gold coin or its equivalent, if the said McCue prefer to pay the interest in such mediums," the said purchaser executed a deed of trust on the same land. Subsequently, by deed dated 2d November, 1863, McCue conveyed the said land to one McCulloch for $23,500, whereof $11,500 was paid cash in hand, and for the balance, payable by McCue to Spears' executor, a deed of trust was again executed on the land. The whole of the $12,000, payable as aforesaid in gold or its equivalent, remains unpaid by McCue to Spears' executor, and to McCue by McCulloch, who has remained in possession of the land from his purchase until the present. The evidence clearly shows that David H. Lipse, the surviving executor, never at any time authorized or sanctioned the receipt by his co-executor of the said purchase money, or of any part of it, in the currency of the Confederate government or in said Virginia bank notes, nor the conveyance of the land. The evidence also shows that in 1862 and 1863, and in fact all during the war, the public sentiment in Botetourt was much excited against persons of Union proclivities, and that persons refusing to take Confederate notes were threatened and denounced as enemies in a public speech delivered in the court house by a member of the general assembly, who had privately advised Samuel Lipse to receive the Confederate notes from Spears' executor.

In January, 1879, David H. Lipse, as surviving executor of Moses Lipse, deceased, instituted this suit in the United States circuit court at Lynchburg,

Va., in order to procure the cancellation of the deeds of conveyance and trust aforesaid, and the enforcement of his vendor's lien on the said land for the unpaid purchase money. In October, 1864, while the war was flagrant, and his co-executor was at his residence in Indiana, a settlement of the accounts of Samuel and David Lipse, executors of Moses Lipse, deceased, was made by James T. Logan, one of the commissioners of the county court of Botetourt county, and in November of that year confirmed by said county court, and ordered to be recorded. Spears' executor and others answered the bill, and numerous depositions were taken on both sides. In his answer, Spears' executor pleaded said settlement of the executorial accounts as an absolute bar to any recovery by the complainants upon their bill.

G. W. Hansbrough and R. F. Mays, for plaintiffs.

T. J. Kirkpatrick and Glasgow & Glasgow, for defendants.

RIVES, District Judge. The leading and decisive inquiry in this case is whether the devisees of Moses Lipse, deceased, are concluded by the facts proven in this case from further prosecution of their claim against the estate of their testator. If that estate has been legally administered, and their rights to the same conclusively and legally settled and barred by the acts of the executor, Samuel Lipse, then their remedy in the premises must be remitted to the official responsibilities of said acting executor. But if, on the other hand, the corpus of that estate still subsists, and is in a situation to be pursued by those interested in its distribution, then the plaintiff in this case, and especially the surviving executor, for himself and other legatees, may be properly heard in the assertion of the lien on the land of Spears, which he bought of Lipse's executors in 1860. Whether a bar in law or in equity exists to the recovery of the plaintiff's rights depends upon the legal effect of the act of Samuel Lipse as executor of his testator, Moses Lipse. If he had the right to receive Confederate money for a confessedly specie demand, and did go willingly and demand the same, and thereby satisfy the claims of the legatees, to that extent, and that extent alone, he may be held exempt from responsibility; but if, on the contrary, he received worthless currency in payment of a specie debt well secured on valuable real estate, without proof of the necessity thereof, he is guilty of a devastavit, and there is nothing in such act to devest the devisees of Moses Lipse, deceased, of their interest in or lien upon the estate of their testator for their legacies. So far as the complainant, David H. Lipse, as the surviving executor, and suing in behalf of his co-legatees, is concerned, there is scarcely a pretense that his suit is barred by the settlement of the accounts of Samuel Lipse, his co-executor. These accounts are wholly ex parte as to him, without notice of any kind, and in his absence in another state during the Rebellion, when all intercourse and correspondence were prohibited by law. I do not suppose, under the proofs in this cause, any pretension can be rightfully made to the privity, actual or implied, of the chief complainant to this settlement made by Samuel Lipse in his own name and that of his co-executor. The whole interest of this complainant in his father's estate was promptly subjected to sequestration through Samuel Lipse, the acting executor; and, if this illegal act is validated in this case, I may safely say that it will be the first one in which this act of the insurgent states has been countenanced and enforced in a court of the

United States. The lien of the devisees on the testator's lands for the purchase money can only be devested by strict proofs of its payment, or by deed conveying the legal title. Touching the first, I do not understand that any claim is or can be advanced for the validity of a payment in Confederate money for an ante-bellum debt. It is conceded in the argument by defendant's counsel that it may be regarded as a devastavit on the part of Samuel Lipse, but the defendant, Glasgow, denies his complicity in or responsibility for it. But in the second point it is alleged that the deed of Samuel Lipse as executor, dated the 7th of April, 1863, conveying said Moses Lipse's lands to Spears' executor, passed the legal title, and devested the interest of Moses Lipse's heirs and devisees. It is not pretended that this deed could have this effect, apart from the act of March 5, 1863, of the general assembly of Virginia. Such an act, however, has been pronounced invalid so far as investments in Confederate money under sanction of state courts are concerned; and, for a stronger and more cogent reason, it is invalid so far as it militates against the remedies and rights of loyal citizens of other states. The act is one emphatically of belligerency and of legislative spoliation upon claimants in this state who chanced to be found by the war on the loyal side. It would be a reflection upon the victory of the Federal arms if such a legislative contrivance could avail, after the cessation of war, to override and defeat the remedies and interests of loyal citizens of other states. I have no hesitation, therefore, in pronouncing this act of assembly a nullity, and that the defendant can claim nothing under this deed. I hold, therefore, that the transaction stands as if no deed had been made by Moses Lipse's executor; that the legal title is still outstanding in the surviving executor, David H. Lipse; that no valid payment has been made by Spears' executor; and that a lien still subsists in behalf of the complainant upon the lands purchased of Samuel Lipse, executor of Moses Lipse, by said C. C. Spears in his lifetime.

It is the duty of this court to uphold and enforce the will of Moses Lipse. It was made upon the eve, and doubtless in view of the probability of, war. The testator had a large family, scattered in the different states of the Union. To secure their interests in case of a civil conflict, he took the precaution of making a son in Indiana and one in Virginia jointly executors of his will, with power to sell his real and personal estate, and distribute the proceeds among his children, subject to the advancements enumerated in his will. Doubtless, he presumed he could in this way guard and protect the interests of his nonresident descendants from the violence and antagonism of the threatened war of sections. His resort to this precaution was wise and reasonable. Be this, however, as it may,—whether designed or accidental,—his will must prevail; and nothing can be better settled than that both of these executors must concur in the execution of a joint power, and that it cannot be executed by one alone. The knowledge of this act is brought distinctly to the notice and acknowledgment of the defendant, Glasgow, by the recitals in the deed he took of Moses Lipse's executor. That deed is the leading title paper of the derivative purchase from said Glasgow, and nec-

essarily put subsequent purchasers on inquiry into the effect of their deeds. If there was an infirmity in Samuel Lipse's deed to Glasgow as executor, they took subject to that infirmity, under the familiar doctrine of caveat emptor. If Glasgow got no title, neither did the purchasers from him; nor can they complain of this, because the recitals of their title paper call their attention especially to the fact how and why they claimed, to wit, the validity of a deed from one alone of two parties charged with the execution of a joint power. If they made a mistake, however grievous, they must bear the consequences of it. For these reasons the court will hold all the purchasers under Glasgow subject to the outstanding liens of Moses Lipse's devisees.

But it is urged that this lien has been extinguished by Glasgow's payment to Samuel Lipse. I have heretofore announced the general principle that a fiduciary, whether executor, trustee, or agent, cannot take worthless currency in payment of a specie debt, unless he is prepared to justify it by extraneous circumstances; that giving a credit therefor amounts, in an executor, to a devastavit on his part, and a debtor unfairly imposing such payment upon him shall be held liable therefor. Under the light of these adjudications, let us look at the transactions betwen Glasgow, Spears' executor, and Samuel Lipse, Moses Lipse's executor. Under the facts and proofs of this cause, I should do injustice to Mr. Glasgow's intelligence if I should call in question his full knowledge that his testator's debt to Lipse was not payable in Confederate money, and that the receipt of it by the latter would be a devastavit on his part. I readily concede it was a venial zeal on his part for his deceased friend, Spears, to propose once the liquidation of his debt in Confederate money; but when that was once refused, as is clearly proven in the case, on the express ground that such currency "was of no value," it ceased to be a virtue, or even excusable, when renewed, and a check upon the Fincastle Bank was tendered and received in lieu of Confederate money. This court is bound to take notice judicially of the fact that in 1862 the banks traded only in Confederate money, and that a check upon one of them was payable generally in such currency; hence there was no substantial difference between the bank check and Confederate notes as a medium of payment. The testimony in this case by the receivers of these checks demonstrated this fact, if, indeed, any corroboration be needed. It is very manifest, Mr. Glasgow saw in this transaction a profitable speculation for his deceased friend's estate. It would have been a handsome thing to acquire $10,000 worth of good Botetourt land for about $2,000 in a depreciating currency; but, to accomplish this, he must abide the responsibilities cast upon him by the proofs of his activity in pressing his payment, and the state of terrorism and denunciation against those refusing this currency. He doubtless has failed in this speculation; but how stands it with the surviving executor, D. H. Lipse? His whole patrimony is dispersed to the winds, and has gone to swell the fisc of the insurgent government that he was opposing, and which is now no more. There can therefore be no comparison between the hardships of the two cases.

The court is constrained, therefore, in this view of the case, to

decree the nullity of the deed from Moses Lipse, executor, to Glasgow, and the cancellation of the same; and unless the said Glasgow, as executor, or some one for him, shall in a reasonable time (say 90 days) pay D. H. Lipse, surviving executor of Moses Lipse, deceased, the amount of the two deferred payments of 1861 and 1862, with interest from date of maturity, then said D. H. Lipse, as executor, or some one for him, shall proceed to sell the tract of land formerly belonging to Moses Lipse, on the usual terms, and hold the proceeds for distribution according to the rights of the parties, as may hereafter be ascertained by reference to a commissioner.    If the said Glasgow so elects, proof can be taken as to who voluntarily received their legacies in Confederate money, and the amounts so paid.    While this reservation is made for the defendant, Glasgow, so that he may not be prejudiced in any claim he may be advised to assert in the state courts against such of the parties as may have voluntarily received their legacies, or any portion of them, in a depreciated currency, he cannot now, or at any time hereafter, be entitled to a credit for any such payment to Samuel Lipse, the resident executor, in Confederate money, already disallowed by this court.

Decree:    That complainant, D. H. Lipse, surviving executor of Moses Lipse, deceased, recover of William A. Glasgow, executor of C. C. Spears, deceased, the sum of $9,905.32, with interest thereon from the 3d day of March, 1862, and costs, and that unless said debt, interest, and costs be paid within 60 days, the lands in the bill mentioned be sold.

From this decree an appeal was taken to the supreme court of the United States.